No. 1815.—MANSFIELD'S ASSIGNEE et al. v. McLEARN & CHURCH.

A contract of charter of a steamboat, during the late war, made at New Orleans after the city came under the lawful control and power of the United States, to carry on trade with the city ot Shreveport and surrounding country then under the control and power ot the insurgent forces, is null and void, and no action lies to enforce it.

Permits given by the military commander of the Gulf Department to carry on trade with the insurgents and transport the respective commodities of commerce through the lines of military occupations, were without any legal torce or effect. The a·t of Congress of July 13, 1861, gave to the President of the United States power, in his discretion, to license commercial intercourse between citizens residing within those sections of the country where the lawful authority prevailed and those districts where the insurgent forces held control. Under this statute, licenses or permits given by any other authority were nullit es.

APPEAL from Sixth District Court of New Orleans. *Duplantier*, *J. C. Rodney May* and *W. H. Hunt*, for plaintiffs and appellants. *Walter H. Rogers*, for defendants and appellees.

TALIAFERRO, J.  The defendants are sued for nine thousand dollars, alleged to be for the charter of the steamer Arizona and for four thousand dollars damages to the boat while under the control of the defendants.

The answer is a general denial.  The defendants afterwards filed a peremptory exception in bar of the action, on the ground that the pretended charter of the steamer, if made at all, was for the purpose of carrying on an illicit trade with the so-called Confederate States, at

that time enemies to the United States, and this to the knowledge of the owners and their agent, who were interested therein; that, in this respect, the chartering of the boat, if chartered at all by the defendants, was *contra bonos mores* and utterly null.

The case was tried before a jury and the verdict was in favor of the defendants. From the judgment of the court below the plaintiffs appeal.

In the early part of March, 1865, Mansfield and another, then owners of the steamer Arizona, chartered her through their agent, Bloomer, to certain parties to carry supplies of various kinds to Shreveport, and on the return to bring a load of cotton. There was no written instrument showing the character and terms of the contract. There is a singular discrepancy in the testimony of the witnesses in several very important points. The agent of the owners swears that he chartered the boat to McLearn, Church, Irwin and Carroll, and that the owners were to have a fair compensation for the use of the boat to make the trip. Irwin swears that he chartered the boat for himself and McLearn, and that he (McLearn) and Bloomer were to settle the amount to be paid for the boat on her return. He states that no settlement was ever made. McLearn and Church, in their testimony, deny that they had anything to do in chartering the boat. The length of time the boat was to be used was not definitely agreed upon, neither was the compensation fixed.

Bloomer says: "They thought it would require about thirty days to make the trip. Considering the scarcity of boats at that time, I consider she was well worth three hundred dollars per day."

It seems that the expedition proved to be an utter failure. The boat left the port of New Orleans, proceeded a short distance up the river and returned the next day in a leaky condition. The cotton bagging, groceries, etc., put on board, were damaged; and we find in the evidence the record of a suit of McLearn and Church against the Arizona and owners for damages to the amount of $2249. This suit was filed twenty-sixth of April, 1865. The testimony in regard to the condition of the boat at the time she left port seems to establish that she was in good order. She encountered a storm the night after leaving, and in consequence lay to until next day, when it was found that she was leaking, and that there was a good deal of water in the hold. This suit is brought upon a contract of charter. A pretty careful examination of the record does not satisfy us that there was such a contract entered into. There is certainly some difficulty in determining from the evidence who were the parties who chartered the boat, if such a contract was made. No price that we can find was fixed, and we see no basis upon which a judgment could be pronounced.

Lastly, the peremptory exception, we think, is conclusive against the plaintiffs. At the time these transactions took place a state of war

28

·existed in this country. All the northern part of Louisiana was then under the power and control of the rebel government. Commercial intercourse between those sections of the country, where the lawful authority of the United States prevailed, and those where the insurgents held rule was interdicted. New Orleans was then under the United States authority, Shreveport within the Confederate lines. It is shown that the parties who got up this adventure had obtained permits from the military department of the Gulf, and that a courier had been dispatched to Shreveport to obtain permission to go up the Red river. This was unavailing. No one except the President of the United States had authority to grant such permits. See on this ·subject the decisions of the Supreme Court of the United States; ·3 Wallace's Reports, 617; ib. 5 vol. 631, and 6 Wallace, p. 531.

It is therefore ordered, adjudged and decreed that the judgment of the district court be affirmed and that this suit be dismissed at ·plaintiffs' costs.